# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### DANVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Case No. 4:13cr00011-003 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| DAVID OWEN JONES, | ) | By: Hon. Jackson L. Kiser |
| | ) | Senior United States District Judge |
| Defendant. | ) | |
| | ) | |

Defendant David Owen Jones was arrested outside his home on August 30, 2011, following an unscheduled and, obviously, unwelcome visit from Patrick County Sheriff's officers. Prior to his arrest, Officer Eric O'Connell and Major Garry Brown discovered a patch of marijuana plants in a field near Jones's home; when they went, without a warrant, to ask Jones whether he had observed any strange activity in the field next to his home, they discovered marijuana plants in Jones's back yard and on his back porch. Because Jones believes that visit to be an unconstitutional search under the Fourth Amendment, Jones moved to suppress the evidence. I held an evidentiary hearing on his motion on August 12, 2013. Following supplemental briefing by the parties, the matter is now ripe for decision. For the reasons stated below, I find the warrantless entry into Jones's back yard was reasonable under the circumstances and was not a violation of the Fourth Amendment because "a police officer not armed with a warrant may approach a home and knock, precisely because that is 'no more than any private citizen might do.'" Florida v. Jardines, --- U.S. ---, 133 S. Ct. 1409, 1416 (2013) (quoting Kentucky v. King, 563 U.S. ---, ---, 131 S. Ct. 1849, 1862 (2011)). Jones's motion will be denied.

## I.    FACTS

In approximately July of 2011, Officer Eric O'Connell received a tip from an informant about marijuana growing in a field off Dick and Willie Road in Patrick County, Virginia. [1]  The informant told Officer O'Connell that she had dropped off a man named "Brent Reynolds" (a co-defendant who is not a party to this motion) at the field with watering cans, fertilizer, and other horticultural paraphernalia; at that time, Reynolds allegedly told her that he was tending a marijuana crop.  Although the informant could not pinpoint the location of the field, she told Officer O'Connell that she could show him where she dropped off Mr. Reynolds.  Soon thereafter, Officer O'Connell and at least one other officer accompanied the informant to the field, where she indicated where she dropped off and picked up Mr. Reynolds.

Over the course of several hours, the officers looked hither and yon for a marijuana crop, ultimately discovering a crop of nineteen plants near a creek on the property.  They monitored the crop for a period of time, hoping to catch an individual tending to it.  When no one came, the officers discussed further surveillance on the crop to discover its owner.  For reasons unknown and unimportant, additional surveillance was never performed and, on August 30, 2011, Officer O'Connell returned to the field to "eradicate" the crop.  Rather than permit the marijuana to continue to grow in hopes of catching its owner, Officer O'Connell wisely believed it better to destroy the crop with no arrest and keep the product out of his community.

After Officer O'Connell, Major Garry Brown, and others destroyed the nineteen plants, Officer O'Connell suggested, "on a whim," that the officers go to the nearest house and ask the owner if he or she had seen anyone frequenting the field.  At the time, none of the officers knew that David Jones lived on the property nearest the field, and in fact did not know if *anyone* lived

---

[1] Eric O'Connell is a Task Force Officer with the Bureau of Alcohol, Tobacco, Firearms and Explosives, as well as head narcotics officer for the Patrick County Sheriff's Office.  Additionally, the time frame encompassing Officer O'Connell's communication with his informant is unclear.

there. Officers did not search the land records to determine who owned the property on which the marijuana was found, nor did they have any indication that the owner of the nearby residence was involved with the cultivation of the nineteen plants.

When they arrived at the nearest driveway, it was flanked on either side by fence posts (but no fence), traffic pylons, and two "No Trespassing" signs.[2] The house was not visible from the road, and the property was densely wooded. The officers proceeded down the long drive, passing at least one other "No Trespassing" sign indicating that visitors were not welcome. When they arrived at the two-story home set back in the woods and surrounded on the sides and back by trees, shrubbery, and overgrown grass, they were greeted by two more "No Trespassing" signs; one was on the upper-level, exterior, front wall of the house, and the other was hanging to the right of the front door. Officer O'Connell testified that there were no cars on the property and he did not think anyone was home, but he proceeded onto the front porch to knock on the front door. At the same time, Officer Brown followed a worn path around the side of the house towards the back yard. According to both Officer O'Connell and Officer Brown, it is common for residents in Patrick County to welcome guests via the back door.

According to Officer O'Connell, a few seconds after he knocked on the front door, Officer Brown called out, "Eric, come here." Officer O'Connell testified that, after he knocked on the door and after Officer Brown went around the side of the building, he saw an extension cord snaking around the side of the house, towards the back yard. When he joined Officer Brown at the back of the house, he saw what prompted the outburst: numerous marijuana plants were planted in Jones's back yard. Officer O'Connell testified that the plants were in "very close proximity to the rear of the house." On the back porch, someone (presumably Jones) had planted

_____

[2] Various signage on the property read, "No Trespassing," "Posted: Private Property," "Keep Out," and other similar warnings. Neither a fence nor a gate surrounded the property.

more plants in pots and had left green tote bags on the porch.[3]  As the officers inspected the remainder of the back yard, they found plants all the way to the woods that surrounded Jones's yard, along trails leading through the woods, and down to a creek that runs through the woods. Near the creek, they found totes of a similar make and color as those on Jones's back porch.

Immediately, the officers called Investigator Katharine Layman with the Patrick County Sheriff's Office.  They told Investigator Layman what they had stumbled upon and asked her to obtain a search warrant while they stayed on Jones's property to secure the scene.  Investigator Layman (who did not testify at the evidentiary hearing), submitted an affidavit in support of the application for a search warrant which listed the following "material facts," in total:

> According to Patrick County Sheriff's Office Investigator Darrell Rorrer[4] and Patrick County Sheriff's Office Major Garry Brown, they have both observed over 50 [m]arijuana plants growing in the back yard approximately 20 feet from the back of 2310 Dick and Willie Rd in Patrick County on this date (8/31/11).  They describe trails leading from the home to the woods where other [m]arijuana plants are planted.  They also observed [m]arijuana plants growing in totes that are the same totes that are located on the back porch of the house.

(Aug. 12, 2013, Evidentiary Hr'g, Def. Ex. 6 [ECF No. 74-6].)  State Magistrate C. L. Corns issued a search warrant based on Investigator Layman's affidavit.

While the officers were waiting at Jones's home for the search warrant, Jones arrived back at his home.  When he drove down the driveway to his house, Officer O'Connell and others blocked his car so that he could not leave.  He subsequently admitted that the plants were his. Shortly thereafter, the officers executed the search warrant and identified approximately 182 plants and various other paraphernalia associated with growing, cultivating, and harvesting

---

[3] The purpose of the totes was unclear.  They may have been used for transplanting the plants, or possibly to carry harvested marijuana.

[4] No one mentioned Investigator Darrell Rorrer at the evidentiary hearing.  The only instance of his name in the entire record is in Investigator Layman's affidavit.

marijuana. (See Aug. 12, 2013, Evidentiary Hr'g, Def. Ex. 5, pg. 6:10-7:8 [ECF No. 74-5].) According to Officer O'Connell's grand jury testimony, however, it appears they ascertained the number of plants before calling Investigator Layman to request a search warrant.[5]

David Jones was indicted on three counts of a four-count indictment on February 21, 2013. (See Indictment, Feb. 21, 2013 [ECF No. 3].) On June 12, 2013, he moved to suppress "any and all physical evidence seized from his home and curtilage on August 31, 2011 . . . ." (Mot. to Suppress, June 12, 2013 [ECF No. 66].) At the evidentiary hearing, Jones filed a brief in support of his motion. (Def. Mem. in Supp. of Mot. to Suppress, Aug. 12, 2013 [ECF No. 73] [hereinafter "Def. Mem."].) The Government responded on August 19, 2013, and Jones replied that same day. (See Gov't Resp. in Opp. to Def.'s Mot. to Suppress, Aug. 19, 2013 [ECF No. 76] [hereinafter "Gov't Resp."]; Def. Reply Mem. in Supp. of Mot. to Suppress, Aug. 19, 2013 [ECF No. 77].)

## II.    STANDARD OF REVIEW

In examining a Fourth Amendment claim, a court must first determine whether the defendant in question "had a reasonable expectation of privacy in the area searched or the item seized." United States v. Rusher, 966 F.2d 868, 873-74 (4th Cir. 1992). A warrantless search or seizure violates "the Fourth Amendment only if [the defendant] manifested a subjective expectation of privacy . . . that society accepts as objectively reasonable." California v. Greenwood, 486 U.S. 35, 39 (1988). The defendant bears the burden of proving that he has a reasonable expectation of privacy. United States v. Ramapuram, 632 F.2d 1149, 1154 (4th Cir. 1980). "What is a reasonable expectation of privacy is by definition related to time, place and

---

[5] "In all, I think at that specific location, there was [sic] 182 plants, all various sizes and some labeled, some not. So, we come [sic] back to the residence at that point. We secure the scene. **We contact the Lieutenant of General Investigations, Betsy Layman, and she obtained a state search warrant based on the evidence that we had already located for the residence . . . .**" (Def. Ex. 5, pg. 7:6-14 (emphasis added).)

circumstance." Id. (quoting United States v. Vicknair, 610 F.2d 372, 380 (5th Cir. 1980)). If the area searched or property seized comes within the ambit of the Fourth Amendment, police need either a warrant, exigent circumstances, or some other recognized, constitutionally permissible justification for their presence in or on a defendant's home or protected property. See U.S. CONST. amend. IV (guaranteeing "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches or seizures . . . .").

### III.  DISCUSSION

The "touchstone" of the Fourth Amendment analysis is "the question [of] whether a person has a 'constitutionally protected reasonable expectation of privacy.'" Oliver v. United States, 466 U.S. 170, 177 (1984) (quoting Katz v. United States, 399 U.S. 347, 360 (1967)). The Amendment itself "'indicates with some precision the places and things encompassed by its protections': persons, houses, papers, and effects." Jardines, 133 S. Ct. at 1414 (quoting Oliver, 466 U.S. at 176). By its terms, then, the Amendment does not "prevent all investigations conducted on private property. . . . But when it comes to the Fourth Amendment, the home is first among equals." Id.; see also Oliver, 466 U.S. at 178 (discussing the "open fields" doctrine). Because the right to be free from "unreasonable government intrusion" in one's home would be of little consequence if an officer could stand on one's front porch and peer into an individual's home "with impunity," the courts have "regard[ed] the area 'immediately surrounding and associated with the home'—what [the] cases call the curtilage—as 'part of the home itself for Fourth Amendment purposes.'" Id. (quoting Oliver, 466 U.S. at 180)). In recognition of the importance of the home in the Fourth Amendment context, the protection afforded "curtilage" has been said to be "a protection of families and personal privacy in an area intimately linked to

the home, both physically and psychologically, where privacy expectations are most heightened." California v. Ciraolo, 476 U.S. 207, 212-13 (1986).

To be sure, most homes are different, and the uses to which people put the property around their homes and the extent of the privacy they expect on that property varies. As a result, the Supreme Court has developed a four-factor test to determine whether the area surrounding a home is "curtilage," and is thus subject to Fourth Amendment protections. The factors are: "(1) the proximity of the area claimed to be curtilage to the home, (2) whether the area is included within an enclosure surrounding the home, (3) the nature of the uses to which the area is put, and (4) the steps taken by the resident to protect the area from observation by people passing by." United States v. Dunn, 480 U.S. 294, 301 (1987). Although there are various factors to weigh, "[t]he 'centrally relevant consideration' in any curtilage determination is 'whether the area in question is so intimately tied to the home itself that it should be placed under the home's umbrella of Fourth Amendment protection.'" United States v. Wells, 648 F.3d 671, 677 (8th Cir. 2011) (quoting Dunn, 480 U.S. at 301). Despite the lack of hard-and-fast rules in the curtilage-determination arena, and as is relevant here, courts have held that "[a] backyard that is accessible only by walking around the side of a home is a place generally recognized as 'an area intimately linked to the home, both physically and psychologically, where privacy expectations are most heightened.'" Id. (quoting Florida v. Riley, 488 U.S. 445, 452 (1989) (O'Connor, J., concurring)); see also Ohio v. Robinette, 519 U.S. 33, 39 (1996) (noting that the Supreme Court has "consistently eschewed bright-line rules [in the Fourth Amendment context], instead emphasizing the fact-specific nature of the reasonableness inquiry.").

Therefore, I must resolve two questions: first, did the officers enter the curtilage of Jones's home when they went down his driveway, onto his front porch, around the side of his home, and into his back yard; and second, was that entry reasonable?

With regard to the first question, I conclude that the officers did enter the curtilage of Jones's home when they stepped onto his front porch and simultaneously walked around the side of his home and into his back yard.[6]  With regard to the front porch, the Supreme Court has expressly said that "[t]he front porch is the classic exemplar of an area adjacent to the home and 'to which the activity of home life extends.'"  Jardines, 133 S. Ct. at 1415 (citing Oliver, 466 U.S. at 182 n.12).  The side and back yards, however, are closer questions.

In considering the Dunn factors, I am compelled to conclude that the side and back yards are also curtilage.  Regarding the first factor, the side and back yards are in direct contact and close proximity to the physical structure of Jones's home.  Pictures of the home show that the side yard is a narrow passageway around the house with no more than five feet separating the wall of the home from the densely wooded area that surrounds the home.  (See, e.g., Aug. 12, 2013, Evidentiary Hr'g, Def. Ex. 4 [ECF No. 74-4]; Def. Mem. pg. 12-14.)  The back yard, though considerably larger, is still in close proximity to the home.  In fact, Officer O'Connell

---

[6] The government asserts that Jones did not have a reasonable expectation of privacy in his driveway.  See Williams v. Garrett, 722 F. Supp. 254, 258 (W.D.Va. 1989) ("It is essentially settled, as a matter of federal law, that a landowner does not have a reasonable expectation of privacy in a rural driveway.")  Jones disagrees.  Because I conclude that the officers were authorized to enter his property despite any expectation of privacy on his behalf, see infra pgs. 10-11, I do not need to answer the question of whether the posted "No Trespassing" signs altered his expectation of privacy.  See Williams, 722 F. Supp. at 258 (noting that it is "especially true" that there is no reasonable expectation of privacy in a rural driveway "where the owner has no blocked the driveway or posted 'no trespassing' signs.")  A necessary prerequisite to a Fourth Amendment violation is a reasonable expectation of privacy.  See California v. Greenwood, 486 U.S. 35, 39 (1988).  If Jones did not have such an expectation, as the government argues, there cannot be a Fourth Amendment violation.  If he did have such an expectation, the officers were nonetheless authorized to go down his driveway.  See, e.g., Rogers v. Pendleton, 249 F.3d 279, 289 (4th Cir. 2001) ("[J]ust as private citizens may approach a home, absent contrary instructions from the owner, to knock on a door, so may the police approach without probable cause, a warrant, or exigency.").

testified that the plants in Jones's back yard were discovered in "very close proximity to the rear of the house."

Secondly, although there is no fence surrounding the side or back yards, the yards are surrounded by densely wooded areas, which create a very real barrier around Jones's home. (See Aug. 12, 2013, Evidentiary Hr'g, Gov. Exs. 1 & 2 [ECF Nos. 74-7, 74-8].) Additionally, the driveway and home were adorned with "No Trespassing" signs. (See Aug. 12, 2013, Evidentiary Hr'g, Def. Exs. 1-4 [ECF Nos. 74-1 thru 74-4].) While such signs do not, in and of themselves, create a right to privacy or automatically place an area under the Fourth Amendment's protections, they do assist in creating a barrier to the property, albeit one that is not impenetrable. See, e.g., Oliver, 466 U.S. at 173 (holding that "No Trespassing" signs did not make an area subject to Fourth Amendment protections); Edens v. Kennedy, 112 Fed. App'x 870, 876 (4th Cir. 2004) (unpublished) (noting that there are "numerous cases upholding the entry of police officers into areas enclosed by fences or marked with 'No Trespassing' signs.").

Considering the third Dunn factor, Jones had put the back yard to a use common of such areas; he planted plants there. The nature of the plants (marijuana) does not undercut his purpose. While the unkempt nature of the yard weighs in the Government's favor, the Fourth Amendment's protections do not turn on the quality of one's landscaping.

Fourth and finally, Jones had taken numerous, reasonable steps to "protect the area from observation by people passing by." Dunn, 480 U.S. at 301. The home was secluded in the woods; it was set at the end of a long driveway; it was surrounded on almost all four sides with dense trees and shrubbery (save for the driveway); he had posted numerous "No Trespassing" signs; and his driveway boasted gate posts and traffic pylons on either side. Short of a locked

gate or fence surrounding his property, see Edens, 112 Fed. App'x at 875, I am hard-pressed to think of a home more unwelcome to passers-by.

Given that the area into which the officers entered was protected by the Fourth Amendment, the next question is of vital importance: was the entry onto Jones's property reasonable?  Jones argues that it was not because Officer O'Connell decided to go to Jones's house "on a whim," indicating that he had no suspicion of wrong-doing.  The Government counters that the police had an implied license to enter Jones's property.

Defendant's argument presents a rule that is far too rigid.  In fact, a rule requiring a level of suspicion in every instance has been flatly rejected time-and-time again.[7]  The Government's argument, however, has merit.

In accordance the "habits of the country," McKee v. Gratz, 260 U.S. 127, 136 (1922), the Supreme Court has recognized that "the knocker on the front door is treated as an invitation or license to attempt an entry, justifying ingress to the home by solicitors, hawkers[,] and peddlers of all kinds."  Breard v. Alexandria, 341 U.S. 622, 626 (1951).  In the Fourth Amendment context:

> This implicit license typically permits the visitor to approach the home by the front porch, knock promptly, wait briefly to be received, and then (absent invitation to stay longer), leave. Complying with the terms of that traditional invitation does not require fine-grained legal knowledge; it is generally managed without incident by the Nation's Girl Scouts and trick-or-treaters. Thus, a police officer not armed with a warrant may approach a home and knock, precisely because that is "no more than any private citizen might do."

---

[7] For example, Jones could not argue that the entry would have been unconstitutional if the officers had been in "hot pursuit" of a suspect who fled into Jones's back yard.  See United States v. Santana, 427 U.S. 38, 42-43 (1976).  Nor would it have been unconstitutional for the officers to enter Jones's property if they were attempting to prevent the imminent destruction of evidence.  See Cupp v. Murphy, 412 U.S. 291, 296 (1973).  Likewise, as is relevant here, certainly there is no constitutional violation when the police go where an owner has permitted them to go, even if that permission was implicit.  See United States v. Jackson, No. 12-4559, 2013 WL 4509812, at *4 (4th Cir. Aug. 26, 2013).

Jardines, 133 S. Ct. at 1415-16 (quoting Kentucky v. King, 563 U.S. ---, ---, 131 S. Ct. 1849, 1862 (2011)).  This rule, not surprisingly, is known as the "knock-and-talk rule."  See Rogers v. Pendleton, 249 F.3d 279, 289 (4th Cir. 2001).

Applying this rule, I believe Officer O'Connell and Major Brown were acting constitutionally when they attempted to speak with the owner of the residence, even though they did not know who he was and they did not suspect him of any wrongdoing.  I am not aware of any case—and Jones has not pointed me to any—in which a lack of probable cause or even vague suspicion overcame this exception to the warrant requirement.  In fact, the Fourth Circuit has made it exceedingly difficult for a homeowner to withdraw the implicit consent which underpins the "knock-and-talk" rule.[8]

In this case, the "knock-and-talk" exception to the warrant requirement permitted the officers to drive down Jones's driveway, step onto his front porch, and knock on his front door.  The Government argues that Jones's back yard is included in the area police are permitted to access as part of a constitutional "knock-and-talk."   While the "knock-and-talk" rule does not provide blanket protection to officers who seek access to a home through any and all doors, see Young v. City of Radcliff, 561 F. Supp. 2d 767, 788 n.12 (W.D.Ky. 2008) ("Sneaking around the backyard is not part of a constitutional 'knock and talk.'"), it does permit officers to seek entrance elsewhere if the appropriate circumstances exist.  See Edens, 112 Fed. App'x at 874.

---

[8] Edens, 112 Fed. App'x at 875 ("We hold, however, that if the owner of a home encloses the curtilage with a fence, locks the gate, and posts 'No Trespassing' signs, the effect for Fourth Amendment purposes is to extend the walls of the home to the edge of the curtilage.  This is because the act of sealing the property creates an elevated expectation of privacy. . . . In the absence of a fence with a locked gate, a homeowner is likely to receive visits . . . . Nevertheless, the homeowner can reasonable expect all such visits to cease when he has manifested his intent to exclude strangers by sealing the property around his home and posting 'No Trespassing' signs.  Thus, in the absence of a warrant or exigent circumstances, a police officer may not lawfully breach a locked enclosure around the curtilage.").

For example, in <u>Alvarez v. Montgomery County</u>, the case on which the government relies, police officers in Montgomery County were investigating complaints of underage drinking at a local home. 147 F.3d 354, 356 (4th Cir. 1998). When the officers arrived at the house they suspected was hosting the party, and before knocking on the front door, an officer noticed a sign on the lamppost in the front driveway which said, "Party In Back." <u>Id.</u> at 357. The officers walked to the back of the home, encountered the underage drinkers, and cited the homeowner's son for serving alcohol to minors. <u>See id.</u> In a subsequent § 1983 action, the Fourth Circuit held that the officers' failure to inquire first at the front door was justified and did not constitute a constitutional violation because the "circumstances indicated they might find the homeowner there [in the back]." <u>Id.</u> at 359.

As <u>Alvarez</u> makes clear, and as the Government accurately points out, "the police may circle to the back of the home under appropriate circumstances." <u>Edens</u>, 112 Fed. App'x at 874; <u>see also</u> <u>Alvarez</u>, 147 F.3d at 358. In the present case, the officers' excursion around the side of the house and into the back yard is on similar footing. The facts apparent to the police on August 31, 2011, support the reasonable conclusion that the back yard was a commonly used entrance to the home and that, if the homeowner was present, he might more easily by located via the back entrance.

The "knock-and-talk" rule permits officers to seek entrance at what they reasonably believe to be the "proper entrance" to the home, or where they reasonably believe the homeowner may be found. Here, officers were canvassing the neighborhood for information when they approached the home. Officer O'Connell and Major Brown were seeking the resident of the house for information. At the time, Jones was unknown to them and was not the subject of a criminal investigation. <u>Cf.</u> <u>Jardines</u>, 133 S. Ct. at 1416 (concluding that "the background social

norms that invite a visitor to the front door do not invite him there to conduct a search."). Major Brown noticed a well-worn path around the side of the house and, knowing of the custom of residents in the county to use the back door of the house rather than the front door for entry and exit from the house, he followed the path to the back porch.[9] Major Brown's discovery of the marijuana was mere happenstance. Major Brown's decision to follow the path around the house was reasonable under the circumstances. When he did, the marijuana was in plain view from a point he had a right to be. Thus, there was no illegal search. See California v. Ciraolo, 476 U.S. 207, 213 (1986); United States v. Anderson, 552 F.2d 1296, 1300 (8th Cir. 1977) ("We cannot say that the agents' actions in proceeding to the rear after receiving no answer at the front door was so incompatible with the scope of their original purpose that any evidence inadvertently seen by them must be excluded . . . .").

In other cases in which a "knock-and-talk" was permitted to extend to the back door or back yard, circumstances justified the officers' use of an alternate entrance to the home. In United States v. Raines, officers knocked on the front door of a home but did not receive a response. 243 F.3d 419, 420 (8th Cir. 2001). An officer went to the back yard only after "seeing several cars parked in the driveway" and when the officer "believ[ed] the inhabitants might be outside on a summer evening unable to hear him knocking at the front door." Id. While there were no cars on the property, Officer O'Connell and Major Brown testified unequivocally that it

---

[9] As an alternative argument, the Government maintains that "a power cord ran along that path [around the left side of the house], suggesting that some use of electricity was being made in to the rear of the house," and that Major Brown "surmised that the resident might not actually be in the house, but instead conducting some activity to the rear of the residence." (Gov't Resp. ¶¶ 1, 4.) This argument is incompatible with the facts. Major Brown did not walk down the side of the house because he saw the cord there; he saw the cord on the side of the house because he was already en route to the back yard. When challenged under the Fourth Amendment, police may not respond that what they found justified their actions. Adopting such an argument would eviscerate the warrant requirement of the Fourth Amendment. The facts known to the police before they went around the side of Jones's house are all that is relevant. What they found may justify a subsequent action, but it cannot form the basis for their original decision.

was common in the community to use the back door to the home as the main entrance, and that they observed a path around the side of the home that appeared consistent with this community practice.

In a separate case, the Fourth Circuit held that accessing a back entrance to a home was permissible because, "during the course of surveillance, the officers saw that all guests approached and entered the townhouse through the rear entrance." United States v. Roberts, 467 Fed. App'x 187, 188 (4th Cir. 2012) (per curiam) (unpublished). In the present case, the evidence established that it is the custom and practice of the community to use the back door as the primary means of entrance into the home. This fact, standing alone, will not justify extending a "knock-and-talk" to the back door. When coupled with the presence of the worn path around the side of the home, however, the circumstances were appropriate for the officers to enter briefly into Jones's back yard to attempt to speak with the home's owner. What they were able to see plainly from the subsequent vantage point of the back yard is therefore not subject to Jones's expectations of privacy. See Illinois v. Andreas, 463 U.S. 765, 771 (1983).

At this point, it is important to note that the fact that the marijuana was in "plain view" justifies its seizure, but not a search of the property. See United States v. Davis, 690 F.3d 226, 232 n.11 (4th Cir. 2012). "The plain view doctrine is grounded on the proposition that once police are lawfully in a position to observe an item first-hand, its owner's privacy interest in that item is lost; the owner may retain the incidents of title and possession but not privacy." Andreas, 463 U.S. at 771. "The 'plain-view' doctrine provides an exception to the warrant requirement for the *seizure* of property, but it does not provide an exception for a search. Viewing an article that is already in plain view does not involve an invasion of privacy and, consequently, does not constitute a search implicating the Fourth Amendment . . . ." United States v. Jackson, 131 F.3d

1105, 1108 (4th Cir. 1997). Here, the officers did not search Jones's property when they went into his back yard reasonably believing that he, like many of his neighbors, used the back door as the entrance to his home. Once the police were where they were authorized to be, they saw plants whose incriminating character was evident. See id.; Davis, 690 F.3d at 232 n.11. At that point, they were justified in securing a warrant; the information they had constituted probable cause to issue a warrant to search Jones's home and property.

Obviously, the subsequent search of Jones's property after they saw the marijuana but before the magistrate issued the warrant[10] was improper, but in this case it does not serve to defeat the valid search warrant. The evidence is admissible "even though the evidence validly obtained under a search warrant was previously uncovered in an illegal search." United States v. Whitehorn, 813 F.2d 646, 650 (4th Cir. 1987). If the evidence obtained from the search of his back yard was excluded from the application for the search warrant, there would still have been probable cause to justify the warrant—specifically, the numerous marijuana plants visible from his back door. As such, the warrant was valid and the evidence was properly seized pursuant to that warrant. See United States v. Mowatt, 513 F.3d 395, 405 (4th Cir. 2008); United States v. Fitzgerald, 416 Fed. App'x 238, 242-43 (4th Cir. 2011) (unpublished). Exclusion of the evidence is not a necessary remedy. Accord Whitehorn, 813 F.2d at 650 ("[W]here it appears that evidence 'inevitably would have been discovered by lawful means,' the deterrence rationale of the exclusionary rule has 'so little basis' that the rule should not be applied." (quoting Nix v. Williams, 467 U.S. 431, 444 (1984))).

---

[10] See supra note 5 (and accompanying text).

## IV.    <u>CONCLUSION</u>

To summarize, the officers were within the constitutional boundaries when they went to Jones's house "on a whim."  They were justified in driving down a driveway and onto property that was not fenced, locked, or sealed in any way.  Contrary to Jones's protestations, the existence and volume of "No Trespassing" signs is not dispositive of this point.  The signs are important only in that they are evidence of the owner's desire for privacy, but they did not expand his rights under the Fourth Amendment.  The officers had an implied license "to approach the home by the front porch, knock promptly, wait briefly to be received, and then . . . leave."  <u>Jardines</u>, 133 S. Ct. at 1415-16.  As a result of the customs of the community and the presence of a path around the home indicating that visitors routinely used the back door for entrance, the officers were likewise justified in entering his back yard in an effort to speak with the homeowner.

In <u>Florida v. Jardines</u>, the Supreme Court said the Fourth Amendment's right against unreasonable searches and seizures "would be of little practical value if the State's agents could stand in a home's porch or side garden and trawl for evidence with impunity . . . ."  <u>Jardines</u>, 133 S. Ct. at 1414.  The facts adduced at the evidentiary hearing do not present such a case.  Jones's motion is therefore denied.

The clerk is directed to forward a copy of this Memorandum Opinion and accompanying Order to all counsel of record.

Entered this 30th day of August, 2013.


s/Jackson L. Kiser
                                 
SENIOR UNITED STATES DISTRICT JUDGE